**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| DEBORAH HALE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:14-cv-00036-TWP-MJD |
| | ) | |
| STATE FARM MUTUAL AUTOMOBILE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**ENTRY ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**</u>

This matter is before the Court on Defendant State Farm Mutual Automobile Insurance Company's ("State Farm") Motion for Partial Summary Judgment (Filing No. 46). After being involved in an automobile accident caused by an underinsured motorist and disagreeing with State Farm about the valuation of her claim, Plaintiff Deborah Hale ("Ms. Hale") filed a complaint in state court against State Farm, asserting claims of breach of contract and bad faith and requesting punitive damages. State Farm removed the action to federal court and then moved for partial summary judgment on Ms. Hale's bad faith claim and her request for punitive damages. For the following reasons, State Farm's Motion for Partial Summary Judgment is **GRANTED**.

## I. BACKGROUND

On December 12, 2011, Ms. Hale was driving her vehicle, which was insured by a State Farm automobile insurance policy, in Anderson, Indiana. William Alexander ("Mr. Alexander") was driving his vehicle, and as he approached the intersection through which Ms. Hale was passing, he failed to stop at the red traffic light and struck the passenger-side front corner of Ms. Hale's vehicle. The low-impact accident caused damage to Ms. Hale's passenger-side front bumper, which was estimated to be a $1,720.07 loss. At the time of the accident, Mr. Alexander

was insured by American Access Casualty Company under a policy with a liability coverage limit of $25,000.00.  Ms. Hale eventually was paid $25,000.00 from Mr. Alexander's insurer.

A.     **Medical Background**

Ms. Hale did not notice or complain of any injuries at the time of the accident, but four days later, she presented to her primary care physician, Dr. William Kopp ("Dr. Kopp"), complaining of neck discomfort and left shoulder pain.  Dr. Kopp diagnosed Ms. Hale with a neck strain.  Twenty-eight days after the accident, Ms. Hale presented to an emergency room on January 9, 2012.  She complained of pain in her left shoulder that radiated down her left arm as well as numbness in her left hand.  She reported that she had been in a car accident the month before, resulting in neck and shoulder pain, but those symptoms had subsided and then returned.  Ms. Hale did not have tenderness to palpation of her left shoulder and neck, but she did have some weakness in her left hand.  While at the hospital, Ms. Hale's cervical spine was x-rayed, which showed no evidence of an acute fracture or malalignment and no evidence of prevertebral soft tissue swelling.  The x-ray did indicate moderate degenerative changes at C5-C6 and some bilateral narrowing of the C5-C6 neural foramen.  The impression from the x-ray was degenerative joint disease.

Ms. Hale had a follow-up appointment with Dr. Kopp on January 12, 2012, and he ordered an MRI of her cervical spine.  The MRI was conducted on January 14, 2012, and it revealed degenerative disc disease at all levels of the cervical spine with mild disc space narrowing at C3-C4, C4-C5, and C5-C6. At C5-C6, the level where surgery later would be performed; the MRI showed broad-based disc osteophyte complex producing effacement of the ventral thecal sac and moderate bilateral foraminal stenosis on the basis of uncovertebral joint arthrosis.

On January 25, 2012, Ms. Hale presented to Dr. Francesca Tekula ("Dr. Tekula") of Central Indiana Orthopedics.   She complained of neck pain, left shoulder and arm discomfort, and

numbness in her left hand. Dr. Tekula reviewed the cervical spine MRI and observed multilevel mild spondylitic changes mainly at C4-5, C5-6, and C6-7. She also observed some neural foraminal narrowing toward the left at the C5-6 level. Dr. Tekula noted that there was no evidence of a fracture or cord injury. Dr. Tekula concluded that Ms. Hale suffered whiplash and had nerve root irritation with no significant neurologic deficits. She recommended a conservative treatment plan, including physical therapy.

Ms. Hale participated in seven physical therapy sessions from January 27, 2012 through February 8, 2012. As a result of the therapy, she realized significant improvement with the symptoms in her left arm but continued to experience neck pain and began experiencing headaches. On February 8, 2012, the same day as her last physical therapy session, Ms. Hale met with Dr. Tekula and reported that she had experienced complete relief of the symptoms in her left arm but was still having some neck discomfort and headaches. Ms. Hale reported experiencing steady improvement. Dr. Tekula's impression was that Ms. Hale had cervical radiculopathy quiescent, cervicalgia, and occipital neuralgia. Ms. Hale suspended her physical therapy for two and a half weeks because of a vacation in Hawaii.

On March 8, 2012, Ms. Hale again presented to Dr. Tekula and reported that her neck discomfort continued but she experienced only one fleeting episode of arm numbness. Ms. Hale was formally discharged from physical therapy on March 21, 2012, because she did not schedule additional appointments upon her return from vacation.

After a four and a half month gap in treatment, and seven months after the automobile accident, Ms. Hale returned to Dr. Tekula on July 26, 2012, complaining of pain in her neck and left arm, which radiated into her hand, as well as weakness and numbness in her left arm. Dr.

Tekula determined that Ms. Hale was a good candidate for surgery, but Ms. Hale wanted to exhaust conservative treatment options, so Dr. Tekula scheduled a C6 selective nerve block.

Ms. Hale returned to her primary care physician, Dr. Kopp, on August 13, 2012. She complained of elevated blood pressure and headaches. Dr. Kopp noted that Ms. Hale had full range of motion of her neck without pain. However, he noted that her symptoms included neck pain with disc symptoms. On August 15, 2012, Ms. Hale received the left C6 selective epidural injection that had been scheduled by Dr. Tekula.

On August 28, 2012, Ms. Hale presented to Dr. Tekula, reporting that as a result of the injection she had no pain for about one and a half weeks but the pain had returned and it was not as bad as before the injection. She reported her arm felt numb and tingly and only occasionally uncomfortable. Ms. Hale and Dr. Tekula agreed that surgery would be the next best course of action, but Ms. Hale chose to wait on surgery until things flared-up again.

Just over a month later, on October 4, 2012, Ms. Hale again presented to Dr. Tekula. She complained of continued neck and arm pain and numbness in her left arm. Dr. Tekula scheduled surgery for Ms. Hale, and on October 30, 2012, Ms. Hale underwent a C5-6 anterior cervical discectomy and fusion. A large osteophyte and some free fragment disc material toward the left in the foramen was discovered during the surgery. There also was right foraminal narrowing due to disc and osteophyte complex. Ms. Hale was discharged from the hospital the next day, and the symptoms in her left arm were resolved.

Ms. Hale had her post-surgery follow-up appointment with Dr. Tekula on November 14, 2012. She reported that her pain was improving and that she was taking over-the-counter medication as needed for pain. Her arm pain was gone, her motor strength was normal, and her sensation was intact. Dr. Tekula's impression was that the radiculopathy was resolved. On

January 9, 2013, Ms. Hale again returned to Dr. Tekula and reported that she was improving and only occasionally experienced slight pain and was not taking any pain medication. Ms. Hale's strength and sensation were normal. Dr. Tekula's impression was that the cervical radiculopathy was fully resolved. Then on April 12, 2013, Ms. Hale visited Dr. Tekula and reported that her neck was doing well and she only experienced some soreness in the evenings. Dr. Tekula recommended that Ms. Hale follow up in six months to assess bone growth and to call if symptoms persisted or worsened. There is no record of any subsequent visit to Dr. Tekula.

Ms. Hale presented to Dr. Kopp for an annual check-up appointment on November 11, 2013, just over a year after the surgery and almost two years after the accident. Dr. Kopp noted that on examination Ms. Hale had full range of motion of her neck without pain.

**B.**     **Insurance and Claims Handling**

At the time of the automobile accident, on December 12, 2011, Ms. Hale was insured by State Farm under a policy with medical payments coverage limited at $25,000.00 and underinsured motor vehicle coverage with a coverage limit of $300,000.00.

Notice of the accident was provided to State Farm on December 13, 2011. On December 15, 2011, a State Farm representative contacted Ms. Hale and Mr. Alexander to gather information about the accident. Ms. Hale confirmed that she was injured in the accident, and the State Farm representative explained the medical payments coverage to her. Throughout the following days and weeks, State Farm representatives continued gathering information regarding the accident and provided information to Ms. Hale.

On December 28, 2011, State Farm requested a medical authorization from Ms. Hale to assist in obtaining medical records and bills for the claims handling process. State Farm directed Ms. Hale to forward her medical bills to State Farm, and it also explained to Ms. Hale its right to

review any medical expenses to determine the necessity and reasonableness of the medical services. On January 3, 2012, Ms. Hale signed a medical authorization, which was received by State Farm on January 16, 2012. Beginning on February 6, 2012, State Farm processed payments for medical services provided to Ms. Hale following the accident. By March 19, 2012, State Farm had paid all of Ms. Hale's medical bills for services received from December 16, 2011 to March 8, 2012, from Dr. Kopp, Central Indiana Orthopedics (Dr. Tekula), and St. John's Health Systems (physical therapy), totaling $2,775.00. These payments were made under Ms. Hale's medical payments coverage.

After a four and a half month gap in treatment and almost eight months following the accident, Ms. Hale called State Farm on August 7, 2012, to inform it that she had been referred to receive an epidural injection and that if the procedure was not successful she may need a discectomy. State Farm requested a new medical authorization from Ms. Hale and informed her that the long gap in treatment and the low-impact nature of the accident raised questions regarding causation. The following day, on August 8, 2012, Ms. Hale's file was assigned to a different State Farm claim representative, Olwen Chapman-Miller ("Ms. Chapman-Miller"), to address the causation issue. Ms. Chapman-Miller called Ms. Hale that same day to investigate the gap in treatment and the necessity of the epidural injection.

After State Farm received a new medical authorization from Ms. Hale on August 23, 2012, it began to send medical records requests to Ms. Hale's medical providers on August 28, 2012. Throughout the ensuing weeks and months, State Farm received medical records and bills from Ms. Hale's medical providers, and Ms. Chapman-Miller usually reviewed the records and bills within days of receipt.

On November 1, 2012, Ms. Hale called State Farm to inform it that she had undergone the discectomy surgery on October 30, 2012, and that it could expect to receive additional medical bills for payment. Ms. Chapman-Miller informed Ms. Hale that a second opinion, such as an independent medical examination or a utilization review, may be necessary regarding the mechanism for injury and the relationship between the accident and the ongoing treatment. Ms. Chapman-Miller also sent a letter on November 1, 2012 to Ms. Hale, advising her that State Farm needed medical bills and records from all of her treating providers in order to further evaluate her claim and that no additional payments would be made under her medical payments coverage until the investigation was complete.

During the following weeks and months, State Farm managers and representatives investigated Ms. Hale's claim and reviewed the medical records and bills when they were received. State Farm followed up with medical providers to request records that had not been provided. Ms. Chapman-Miller called Ms. Hale on January 15, 2013, and they discussed the status of treatment, the status of records requests, and the investigation of the claim. Ms. Hale informed State Farm that at that point in time Mr. Alexander's insurance company was refusing to pay for her loss, so she had hired an attorney. Ms. Chapman-Miller contacted Ms. Hale's attorney that same day, who then faxed a letter of representation to State Farm and revoked any prior medical authorizations. Ms. Hale's attorney informed State Farm that she would collect all medical records and bills and then forward them to State Farm. She indicated that this could take some time.

On January 30, 2013, a State Farm team manager reviewed Ms. Hale's claim and noted that the purpose of Ms. Hale's trip at the time of the accident was not clear from the records. The purpose of her travel was important because if the accident occurred while Ms. Hale was on business, the loss should be covered under workers' compensation law, not under the medical

payments coverage. On January 31, 2013, Ms. Chapman-Miller called Ms. Hale's attorney and left a voicemail message, requesting the purpose of Ms. Hale's trip at the time of the accident and additional medical documentation. Throughout the following months, State Farm continued to receive medical records from Ms. Hale's medical providers. Because of the gap in treatment, the need to determine the purpose of the trip, and the ongoing investigation of causation, State Farm did not process payments for any medical services rendered after the gap in treatment.

State Farm continued to follow up with Mrs. Hale's attorney regarding the production of medical records and bills in addition to information about the purpose of trip at the time of the accident. On April 18, May 1, June 24, and June 25, 2013, State Farm contacted Ms. Hale's attorney's office requesting this information, and State Farm was advised that counsel was still in the process of collecting the information. On June 25, 2013, Ms. Hale's attorney's office advised Ms. Chapman-Miller that Ms. Hale had a lot of medical bills for her treatment, that counsel was still in the process of obtaining medical bills and records from the providers, and that counsel had not yet decided which bills would be presented to State Farm. They asked Ms. Chapman-Miller to follow up with counsel in thirty to forty days regarding Ms. Hale's medical records.

On August 23, 2013, a State Farm injury claim trainer reviewed Ms. Hale's claim to evaluate the mechanism of Ms. Hale's injuries, her ongoing treatment for whiplash and neck pain, and the causal relationship between the injuries and the accident in light of the four and a half month gap in treatment. The injury claim trainer suggested that a utilization review be considered. In preparation for the utilization review, Ms. Chapman-Miller continued following up with Ms. Hale's attorney regarding the medical records and bills on August 27 and September 10, 2013. State Farm received some pharmacy records and medical records on October 8 and 9, 2013.

Ms. Chapman-Miller again contacted Ms. Hale's counsel's office on October 29, 2013, regarding the purpose of Ms. Hale's trip, having still not received that information from Ms. Hale. Her counsel's office called Ms. Chapman-Miller on November 5, 2013, and reported that the purpose of Ms. Hale's trip was personal; she was driving to McDonald's to purchase sweet tea. That same day, Ms. Chapman-Miller processed the request for a utilization review by Rising Medical Solutions. The review was to determine if Ms. Hale's ongoing treatment for whiplash and neck pain and the neck surgery following a four and a half month gap in treatment were related to the low-impact automobile accident.

On December 5, 2013, State Farm received the report of the utilization review prepared by Dr. Carol Hulett ("Dr. Hulett"). On December 10, 2013, a claim processor notified Ms. Chapman-Miller that the report was ready for review. Then on December 18, 2013, Ms. Chapman-Miller studied the utilization review report. As part of the report, Dr. Hulett noted that it was difficult to state with complete certainty the relationship between the accident and the injuries and treatment:

> There is no doubt that her cervical degenerative changes and foraminal narrowing were present prior to the accident. Her MRI that was performed on 1/14/12 did not identify a herniated disc yet at surgery in July, 2012 her surgeon stated that there was a free fragment of disc at the C5/C6 level on the left. It is possible that the accident did injure the disc resulting in her symptoms that eventually were treated surgically. However it is also plausible that her underlying condition of spinal stenosis at C5/C6 had progressed to the point where surgery became necessary or that another unreported event exacerbated her condition. I cannot with complete medical certainty state absolutely which is the case in this situation. As physicians we rely upon history to establish onset and causation. Based on the history provided in the ER I would suspect that she resolved an initial exacerbation of her degenerative condition in the accident and another event again caused symptoms.

(Filing No. 60 at HALE1084.) Dr. Hulett summarily concluded that "[b]ased on the history, it would appear that all of her symptoms were caused by the accident." *Id.* Although Ms. Chapman-Miller thought that the report was not definitive regarding the relationship between the accident and the injuries and treatment, she recommended that State Farm provide medical payments

coverage for the treatment rendered after the gap in care. That same day, on December 18, 2013, the State Farm team manager approved the recommendation to provide coverage up to the $25,000.00 limit.

On January 3, 2014, State Farm made payments to Central Indiana Orthopedics, Central Indiana Neurology, and St. John's Health System, totaling $3,004.93 under Ms. Hale's medical payments coverage. On February 13, 2014, State Farm issued a check to Ms. Hale and her counsel in the amount of $19,220.07 under the medical payments coverage, thereby exhausting the $25,000.00 medical payments coverage available under Ms. Hale's policy.

While the accident was reported to State Farm on December 13, 2011, notice of an underinsured motor vehicle claim was not provided to State Farm until January 17, 2013. Ms. Hale had recently retained counsel, and her counsel's office called State Farm and left a voicemail message asking about the underinsured motor vehicle coverage limit.

On January 18, 2013, State Farm claim representative Denise Chavis ("Ms. Chavis") was assigned to handle any underinsured motor vehicle claim that was presented to State Farm. She reviewed Ms. Hale's file and noted Ms. Hale had pre-existing degenerative disc disease in her cervical spine. Ms. Chavis spoke with a representative of American Access Casualty Company, the insurer for Mr. Alexander, and confirmed that Ms. Hale's claim against Mr. Alexander had not yet been settled. She also spoke with a representative of Ms. Hale's counsel's office and was advised that Mr. Alexander's insurer was being unresponsive and that counsel believed suit would have to be filed and that a claim for underinsured motor vehicle benefits may need to be asserted. Ms. Chavis opened a claim under the underinsured motor vehicle coverage that same day.

On January 25, 2013, Ms. Hale's counsel called and advised Ms. Chavis that Ms. Hale intended to file an underinsured motor vehicle claim with State Farm and that a demand was being

sent to Mr. Alexander's insurer that same day. Ms. Chavis was informed that a formal letter would be sent to State Farm soon. Ms. Chavis confirmed for counsel that the State Farm policy limits were $300,000.00 for underinsured motor vehicle coverage and $25,000.00 for medical payments coverage. Per counsel's request, on February 1, 2013, Ms. Chavis sent a certified copy of Ms. Hale's insurance policy to counsel.

Almost seven months later, on August 15, 2013, Ms. Chavis received a letter from Ms. Hale's counsel stating that Mr. Alexander's insurer had extended an offer of settlement in the full amount of its policy limit of $25,000.00. The letter asked whether State Farm would consent to the settlement offer from Mr. Alexander's insurer or advance a payment of $25,000.00 to preserve its subrogation rights. Attached to the letter to State Farm was a copy of the settlement offer of the full policy limit from Mr. Alexander's insurer, which was dated February 22, 2013, six months earlier. Also attached was a copy of a letter dated March 28, 2013 (five months earlier), from Mr. Alexander's insurer to Ms. Hale's counsel, certifying the limit of the coverage. On August 15, 2013, the same day that Ms. Chavis received counsel's letter, Ms. Chavis completed a search of assets owned by Mr. Alexander and his employment history, obtained authority to consent to the settlement between Ms. Hale and Mr. Alexander, and advised Ms. Hale's counsel of State Farm's consent to the settlement.

Ms. Chavis was advised on August 16, 2013, by Ms. Hale's counsel that a demand for underinsured motor vehicle coverage would be provided soon. She also requested from Ms. Chavis a written confirmation of State Farm's consent to the settlement between Ms. Hale and Mr. Alexander. Ms. Chavis provided that written confirmation the same day. However, Ms. Hale's counsel did not send the demand package for underinsured motor vehicle coverage until a month later, on September 17, 2013. The package consisted of a four-page letter summarizing Ms. Hale's

injuries and medical treatment, an itemization of medical expenses and lost wages incurred as a result of the accident, and approximately four hundred pages of medical records. The demand was in the amount of the full policy limit and provided thirty days to respond to the offer. That same day, Ms. Chavis asked a claim processor to add electronic bookmarks to the records attached to the demand letter and to add the claimed special damages to the electronic evaluation form that Ms. Chavis used as part of her evaluation of the claim. The claim processer completed these tasks on September 23, 2013.

Ms. Chavis reviewed the demand package and the many medical records. In reviewing the medical records, Ms. Chavis learned that Ms. Hale underwent cervical fusion surgery, which raised questions because of the low-impact nature of the automobile accident and the presence of pre-existing degenerative disc disease in the area of the operation on Ms. Hale's cervical spine. On October 9, 2013, Ms. Chavis called Ms. Hale's counsel's office and requested five years of pre-accident medical records from Ms. Hale's primary care physician to help in her evaluation of the claim. Ms. Chavis was directed to a narrative provided by Dr. Tekula that linked the surgery to the accident, but Ms. Chavis still required pre-accident medical records. That same day, Ms. Hale's counsel's office faxed to Ms. Chavis the medical records related to treatment received by Ms. Hale after the accident. About three weeks later, on October 28, 2013, Ms. Chavis received the medical records of Ms. Hale's primary care physician for the five years prior to the accident, which consisted of approximately forty pages.

Ms. Chavis learned that Ms. Chapman-Miller, as part of her review of the medical payments coverage, was requesting a utilization review to determine whether the treatment received by Ms. Hale after a four and a half month gap in care was related to the accident in light of the low-impact nature of the accident and the pre-existing degenerative disc disease in her

cervical spine. On November 4, 2013, Ms. Chavis spoke with counsel's office, explaining that a utilization review was being conducted and that she would complete her evaluation of the underinsured motor vehicle claim after the utilization review and a determination of whether additional medical records would be needed. However, after Ms. Chavis reviewed the pre-accident records from Ms. Hale's primary care physician, which contained no complaints of neck pain or injuries prior to the automobile accident, and after discussing the claim with her team manager, Ms. Chavis determined that she did not need additional records or the results of the utilization review to complete her evaluation of the underinsured motor vehicle claim.

On November 25, 2013, within a month of receiving the medical records she had requested, Ms. Chavis completed her review of the underinsured motor vehicle claim and submitted her evaluation to management to resolve the claim within a range of $123,201.40 to $163,201.40. This amount included $83,472.01 in medical expenses ($20,000.00 more than the medical expenses identified by Ms. Hale's counsel), $7,504.39 in lost wages, and $60,000.00 to $100,000.00 in general damages, reduced by $25,000.00 paid by Mr. Alexander's insurer and $2,775.00 already paid under medical payments coverage. Ms. Chavis also received a telephone call from Ms. Hale's counsel's office, informing her that a lawsuit was going to be initiated against State Farm. Ms. Chavis's manager reviewed the claim evaluation on December 9, 2013, and requested authority to settle the claim for between $123,201.40 and $163,201.40. On December 16, 2013, Ms. Chavis's manager directed her to proceed with settling the claim with Ms. Hale, giving her authority up to $163,201.40. Ms. Chavis extended an offer in the full amount of her authority to Ms. Hale's counsel that same day. The next day, on December 17, Ms. Chavis received a faxed letter from the night before from Ms. Hale's counsel's office, which attached a copy of Ms. Hale's Complaint that had been filed in state court on December 10, 2013, which was the first notice to Ms. Chavis

that a lawsuit actually had been initiated. The full amount of the offer of $163,201.40 under the underinsured motor vehicle coverage was paid in advance to Ms. Hale after the initiation of this action.

## II. <u>SUMMARY JUDGMENT STANDARD</u>

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (internal citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (internal citations and quotation marks omitted).

## III. <u>DISCUSSION</u>

As an initial matter, because this action is brought under the Court's diversity jurisdiction,

the Court applies the substantive law of Indiana, the forum state, in deciding this Motion for Partial Summary Judgment. See *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 634 (7th Cir. 2001). After removing this action to federal court, State Farm moved for partial summary judgment on Ms. Hale's bad faith claim and her request for punitive damages. State Farm argues that there is no factual basis to support a bad faith claim, and with no underlying tort to support a request for punitive damages, the request for punitive damages also must be dismissed. Ms. Hale responds that State Farm caused an unfounded delay in paying policy proceeds and thereby breached its duty of good faith to its insured.

The seminal case in Indiana on the tort of bad faith within the insurance relationship is *Erie Insurance Company v. Hickman*. There, the Indiana Supreme Court noted that "Indiana law has long recognized that there is a legal duty implied in all insurance contracts that the insurer deal in good faith with its insured." *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 518 (Ind. 1993). While the court did not define every contour of the tort of bad faith, it did explain,

> The obligation of good faith and fair dealing with respect to the discharge of the insurer's contractual obligation includes the obligation to refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim.

*Id.* at 519. However, the court also cautioned that this new cause of action, the tort of insurer bad faith, "does not arise every time an insurance claim is erroneously denied." *Id.* at 520. It explained, "[f]or example, a good faith dispute about the amount of a valid claim or about whether the insured has a valid claim at all will not supply the grounds for a recovery in tort for the breach of the obligation to exercise good faith." *Id.* The court determined that "[t]his is so even if it is ultimately determined that the insurer breached its contract. That insurance companies may, in good faith, dispute claims, has long been the rule in Indiana." *Id.*

The court provided another example to give guidance on the tort of bad faith: "the lack of diligent investigation alone is not sufficient to support an award. On the other hand, for example, an insurer which denies liability knowing that there is no rational, principled basis for doing so has breached its duty." *Hickman*, 622 N.E.2d at 520 (internal citation omitted).

Turning to the claim at issue here, notice of Ms. Hale's December 12, 2011 accident was provided to State Farm the following day, December 13 2011. A State Farm representative contacted Ms. Hale and Mr. Alexander on December 15, 2011, to obtain information about the accident. Throughout the following days and weeks, State Farm representatives continued gathering information regarding the accident and provided information to Ms. Hale. On December 28, 2011, State Farm requested a medical authorization from Ms. Hale to assist in obtaining medical records for the claims handling process, and Ms. Hale was directed to forward her medical bills to State Farm. On January 3, 2012, Ms. Hale signed a medical authorization, which was received by State Farm on January 16, 2012. On February 6, 2012, State Farm began processing payments for medical services provided to Ms. Hale following the accident. By March 19, 2012, State Farm had paid all of Ms. Hale's medical bills for services rendered from December 16, 2011 to March 8, 2012, totaling $2,775.00. State Farm did not cause an unfounded delay in its investigation or in processing these payments.

On August 7, 2012, after a four and a half month gap in treatment and almost eight months following the automobile accident, Ms. Hale called State Farm to inform it that she had been referred to receive an epidural injection and that if the procedure was not successful she may need a discectomy. State Farm requested a new medical authorization from Ms. Hale and informed her that the long gap in treatment and the low-impact nature of the accident raised questions regarding causation. The following day, on August 8, 2012, Ms. Hale's file was assigned to Ms. Chapman-

Miller to investigate the causation issue. Ms. Chapman-Miller called Ms. Hale that same day to investigate the gap in treatment and the necessity of the epidural injection. Again, State Farm did not cause an unfounded delay.

Following the epidural injection and discectomy surgery, Ms. Hale called State Farm on November 1, 2012, to discuss the surgery and the new medical expenses. Ms. Hale argues that in November 2012, State Farm had in its possession medical records and bills that far exceeded the $25,000.00 limit under the medical payments coverage, and thus, she argues, State Farm should have paid the medical bills up to $25,000.00 under the medical payments coverage and paid the remainder under the underinsured motor vehicle coverage. Instead of immediately paying these medical expenses, State Farm waited, investigated, and then paid in early 2014 after this lawsuit was initiated. However, Ms. Hale ignores the fact that in August 2012 State Farm informed her that a question about causation was raised because of the low-impact nature of her accident and the four and a half month gap in treatment, which necessitated additional investigation of her claim.

At that point in time, the bulk of Ms. Hale's medical expenses came from her October 30, 2012, discectomy surgery. On November 1, 2012, Ms. Hale called State Farm to inform it of her surgery and that it could expect to receive additional medical bills for payment. State Farm reminded her of the issue of causation and informed her that a utilization review may be necessary. State Farm also advised her that it needed additional medical records and that no further payments would be made under her medical payments coverage until the investigation was complete. Insurance companies are permitted to dispute and investigate claims. State Farm was not advancing an unfounded refusal to pay policy proceeds or causing an unfounded delay in making payment. It also was not refusing to diligently investigate Ms. Hale's claim. To the contrary, State Farm was fulfilling its obligation and exercising its right to investigate the claim, and it already

had paid some policy proceeds with the understanding that it could seek reimbursement if the proceeds were paid in error.

Ms. Hale further asserts that State Farm unreasonably delayed investigating her claim because it waited a year to request the utilization review after it determined that such a review may be necessary. She argues that State Farm's reason for the delay—not knowing the purpose of the trip when the accident occurred—is unjustifiable, asserting that State Farm never asked Ms. Hale for the purpose of her trip throughout the preceding year, and if such information was necessary, State Farm would not have made any of the previous medical payments.

The designated evidence shows that State Farm's failure to investigate the purpose of the trip earlier in its review was a carless oversight, which was promptly addressed when discovered by a team manager. As the Indiana Supreme Court noted in *Hickman*, the lack of diligent investigation alone is not sufficient to support a bad faith claim, 622 N.E.2d at 520. Once State Farm's oversight was discovered, Ms. Chapman-Miller requested the information from Ms. Hale's counsel numerous times throughout 2013. Ms. Hale's counsel's office repeatedly promised that the information was forthcoming and eventually called Ms. Chapman-Miller on November 5, 2013 to report that the purpose of Ms. Hale's trip was personal. That same day, Ms. Chapman-Miller processed the request for a utilization review by Rising Medical Solutions. This delay is attributable to Ms. Hale, not State Farm.

Ms. Hale's argument that State Farm would not have previously paid any medical expenses if it actually did need the information about the purpose of the trip is belied by the fact that State Farm knew that it could recover any medical payments made if it was later discovered that those payments should have been made under workers' compensation coverage.

Concerning the handling of the underinsured motor vehicle claim, Ms. Hale attempts to create a delay by State Farm where the facts show otherwise. State Farm was given notice of a potential underinsured motor vehicle claim on January 17, 2013, when Ms. Hale's counsel's office left a voicemail message asking about the underinsured motor vehicle coverage limit. The next day, Ms. Chavis was assigned to handle any underinsured motor vehicle claim that was presented to State Farm. She reviewed Ms. Hale's file, spoke with a representative of Mr. Alexander's insurer, and confirmed that Ms. Hale's claim against Mr. Alexander had not yet been settled. She also spoke with a representative of Ms. Hale's counsel's office and was advised that Mr. Alexander's insurer was being unresponsive, that counsel believed suit would have to be filed, and that a claim for underinsured motor vehicle benefits may need to be asserted. Thus, Ms. Chavis opened a claim under the underinsured motor vehicle coverage that same day. Approximately a week later, on January 25, 2013, Ms. Hale's counsel called and advised Ms. Chavis that Ms. Hale intended to file an underinsured motor vehicle claim with State Farm and that a demand was being sent to Mr. Alexander's insurer that same day. Ms. Chavis was informed that a formal letter would be sent to State Farm soon.

Almost seven months later, on August 15, 2013, Ms. Chavis received a letter from Ms. Hale's counsel stating that Mr. Alexander's insurer had extended an offer of settlement in the full amount of its policy limit of $25,000.00. The letter asked whether State Farm would consent to the settlement offer or otherwise reserve its subrogation rights. Attached to the letter to State Farm was a copy of the settlement offer from Mr. Alexander's insurer, which was dated February 22, 2013, six months earlier. Also attached was a copy of a letter certifying the coverage limit dated March 28, 2013, five months earlier. On August 15, 2013, the same day that Ms. Chavis received counsel's letter, Ms. Chavis completed a search of assets owned by Mr. Alexander and his

employment history, obtained authority to consent to the settlement between Ms. Hale and Mr. Alexander, and advised Ms. Hale's counsel of State Farm's consent to the settlement. The evidence shows that State Farm did not cause an unfounded delay and any delay was attributable to Ms. Hale.

Further, Ms. Hale's counsel advised Ms. Chavis on August 16, 2013, that a demand for underinsured motor vehicle coverage would be provided shortly. She also requested from Ms. Chavis a written confirmation of State Farm's consent to the settlement between Ms. Hale and Mr. Alexander. Ms. Chavis provided that written confirmation the same day. However, Ms. Hale's counsel did not send the promised demand package until a month later, on September 17, 2013. That same day, Ms. Chavis asked a claim processor to prepare the demand package for her review, which preparation was completed on September 23, 2013. On October 9, 2013, Ms. Chavis asked Ms. Hale's counsel for five years of pre-accident medical records from Ms. Hale's primary care physician to help in her evaluation of the claim. Approximately three weeks later, on October 28, 2013, Ms. Chavis received these medical records.

Then on November 4, 2013, Ms. Chavis spoke with counsel's office, explaining that a utilization review was being conducted and that she would complete her evaluation of the underinsured motor vehicle claim after the utilization review. However, after reviewing the pre-accident records from Ms. Hale's primary care physician, Ms. Chavis determined that she did not need to wait for additional records or the results of the utilization review to complete her evaluation of the underinsured motor vehicle claim.

On November 25, 2013, Ms. Chavis completed her review of the claim and submitted her evaluation to management to request authority to settle the claim within a range of $123,201.40 to $163,201.40, which included $20,000.00 more than the medical expenses identified by Ms. Hale's

counsel and the full amount of lost wages submitted. Ms. Chavis's manager reviewed the claim evaluation on December 9, 2013, and requested authority to settle the claim between $123,201.40 and $163,201.40. On December 16, 2013, Ms. Chavis's manager directed her to proceed with settling the claim with Ms. Hale, giving her authority up to $163,201.40. On that same day, Ms. Chavis extended a settlement offer in the full amount of her authority to Ms. Hale's counsel. Again, the evidence shows that State Farm did not cause an unfounded delay in investigating and processing the underinsured motor vehicle claim. Contrary to Ms. Hale's assertion, Ms. Chavis sped up the investigation and the ability to subsequently pay the underinsured motor vehicle benefit by not waiting on the utilization review and additional discovery once she determined that she had enough information to resolve the claim.

Finally, Ms. Hale asserts that State Farm unreasonably delayed investigation and payment of the claim by requesting additional information and then "when asked what she actually used to determine the value of Plaintiff's claim, [Ms. Chavis's] response was 'I'm not really sure.'" (Filing No. 69 at 27.) Ms. Hale argues that State Farm should not have kept requesting additional information if Ms. Chavis had everything she needed to evaluate the claim and she could not articulate what she reviewed to value the claim.

As shown by the evidence, Ms. Hale's argument and presentation of these facts is not consistent with the context of Ms. Chavis's answer or her review of the claim. A review of the designated evidence reveals that Ms. Chavis's answer came in response to the narrow question of how she calculated the value of "pain" as a component of general damages. She was asked, "Other than your internal thoughts of what the pain is worth, what other sources did you consult in making that evaluation?" (Filing No. 70-5 at 12.) She responded, "In this case I'm not really sure. But it is possible that I spoke with maybe other more experienced reps." *Id.* "Q: Do you remember who,

if you did?  A: No.  Q: Would you have noted that anywhere?  A: No, I wouldn't have." *Id.*  The designated evidence also shows that a second and third representative of State Farm reviewed the claim, and that the second reviewer, a team manager, determined that the claim was not worth the policy limits as demanded by Ms. Hale (Filing No. 60 at HALE0006).  State Farm did not cause an unfounded delay in investigating the claim and paying policy proceeds when it requested additional information to evaluate Ms. Hale's claim, and it did not unreasonably deny payment of policy proceeds by refusing to offer the full policy limits after its thorough review of the claim.

As the Indiana Court of Appeals noted, "Bad faith involves the conscious doing of wrong because of dishonest purpose or moral obliquity." *Johnston v. State Farm Mut. Auto. Ins. Co.*, 667 N.E.2d 802, 805 (Ind. Ct. App. 1996).  "A good faith dispute over the validity or amount of a claim is not sufficient to establish a breach of the duty of good faith and fair dealing." *O'Boy v. State Farm Mut. Auto. Ins. Co.*, 2006 U.S. Dist. LEXIS 42302, at *17 (N.D. Ind. June 13, 2006); *see also Hickman*, 622 N.E.2d at 520.  The evidence designated by the parties shows that there was no dishonest purpose or moral obliquity in State Farm's handling of Ms. Hale's medical payments claim and underinsured motor vehicle claim.  State Farm simply investigated the validity and amount of Ms. Hale's claims and then paid policy proceeds.

State Farm also moved for summary judgment on Ms. Hale's request for punitive damages. It argues that the bad faith claim cannot survive summary judgment, and thus, there is no underlying tort on which an award of punitive damages may be granted.  State Farm asserts that, alternatively, if the Court determines that the bad faith claim can survive summary judgment, there is no clear and convincing evidence of malice, fraud, gross negligence, or oppressiveness that could support an award of punitive damages.  Ms. Hale failed to respond to State Farm's argument regarding punitive damages.

"[T]o recover punitive damages in a lawsuit founded upon a breach of contract, the plaintiff must plead and prove the existence of an independent tort of the kind for which Indiana law recognizes that punitive damages may be awarded." *Hickman*, 622 N.E.2d at 518. The purpose of this rule is "to prohibit the recovery of punitive damages, which is a tort remedy, where no tort had been established." *Id.* The Indiana Supreme Court explained the high bar to obtain punitive damages: "Punitive damages may be awarded only if there is clear and convincing evidence that the defendant acted with malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing . . . ." *Id.* at 520 (internal citation and quotation marks omitted); *see also Johnston*, 667 N.E.2d at 805. "Thus, the mere finding by a preponderance of the evidence that the insurer committed the tort will not, standing alone, justify the imposition of punitive damages." *Hickman*, 622 N.E.2d at 520.

Having determined that State Farm did not breach its duty of good faith and fair dealing to its insured, the Court finds there is no underlying tort on which to base a request for or an award of punitive damages. Furthermore, the designated evidence demonstrates that State Farm did not act with malice, fraud, gross negligence, or oppressiveness when handling Ms. Hale's claim.

## IV. CONCLUSION

The evidence designated by the parties shows that there is no genuine issue as to any material fact regarding State Farm's handling of Ms. Hale's claim for insurance coverage. State Farm is entitled to a judgment as a matter of law on Ms. Hale's claim for bad faith and her request for punitive damages. Therefore, State Farm's Motion for Partial Summary Judgment (Filing No. 46) is **GRANTED** in favor of State Farm and against Ms. Hale.

**SO ORDERED.**

Date: 5/13/2015

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Ashley Haynes
HENSLEY LEGAL GROUP
ahaynes@hensleylegal.com

Sarah Jane Graziano
HENSLEY LEGAL GROUP
sgraziano@hensleylegal.com

Casey Ray Stafford
KIGHTLINGER & GRAY
cstafford@k-glaw.com

John B. Drummy
KIGHTLINGER & GRAY
jdrummy@k-glaw.com